We'll then turn to Aaronson v. Kellogg Company. Is it Mr. Gray? Yes, I'm here, Your Honor. Go ahead. Yes, may it please the court and good afternoon, Your Honors. Chris Gray for plaintiff's appellants. The way that the issues are framed in this case makes a key issue before this court the plausibility or not of plaintiff's allegations that defendant Kellogg had an undisclosed intention to terminate their sub-distributorships, you know, long before that termination, in fact, took place in May of 2017. And I would like to review the timeline of this matter and demonstrate to the court the plausibility of this contention, which was the central it was the central finding of the district court that our allegation of an undisclosed intention was not plausible. The question of fact before this court and a de novo review here is when did Kellogg plausibly decide to make this decision to terminate? What do we know? We know on February 8th of 2017 Kellogg publicly announced its change in distribution program from a decentralized system of distribution under which my clients worked where they picked up goods from local warehouses from master distributors to instead a national centralized distribution system. So this is an enormous change. It made news. It was part of a multi-year cost-cutting program known as Project K that was initially announced way back in 2013. So I think the court would agree that certainly at the time of the announcement of the change defendant would have been aware of its own intention to make a change. So I would like to start the timeline after that announcement February 8th of 2017. Several weeks later February 28th 2017 we have an email to distributors in the field. It's the next to our complaint is exhibit one where Kellogg employee says to the sub distributors, you know, essentially there's been a change and we think we can all work through it and according directly from exhibit one Kellogg will begin distributing Kellogg snacks to each of you to the seven KDC locations throughout the country. I'm going to further quote from exhibit one. This is different from what was the norm. However, many of you have worked to ensure this can be a successful transition of deliveries to you from the KDCs instead of DC locations. So this again is three weeks after the announcement. What is the reasonable inference from this message? It's that the sub distributors will continue to distribute just in a different manner. This is Kellogg's own words after the announcement. Let's look again at actions after again the February 28th February 8th 2017 announcement. This is found at Appendix 46 a responsible employee of Kellogg the regional sales manager named Ted Engel told the senior employee of our of our client LD cookie and Mr. Mastro Simone. He's not a not a client, but he's a senior employee of our of our client. This regional sales manager. Mr. Engel told Mastro Simone he had nothing to worry about and if anything he might get more business because of the change and we go on to quote the statement made to Mr. Mastro Simone that this is DSD not DSDD that his distribution is and you know, essentially therefore Mr. Mastro Simone won't be affected again. This is after the announcement. If the court looks at the four corners of the complaint, this was a reasonable inference for Mr. Mastro Simone to reach because in fact distribution of the New York area is significantly different than distribution elsewhere due to the great number of small neighborhood stores small supermarkets in the urban area, you know in the outer boroughs and you know, other parts of New York such as the C-Town grocery stores small bodegas. So small distributors who can double park. Let's say a box truck in front of these these small shops and deliver through the front door. That's a much different distribution scheme than in other parts of the country where we have vast parking lots and loading docks that kind of thing. So it made sense for the clients and this is the messaging that was out there out there among the community of subdistributors that New York will not be affected because we're just different in New York, you know different type of distribution. So let's go back to then the earlier time frame. If we could all accept the fact that it is difficult to turn an aircraft carrier. It takes some time. This is a nationwide distribution of snacks  Keebler cookies Cheez-Its, you know that we could find in almost any type of retailer. So it's clearly a significant undertaking. You can't just flip a switch and those products don't just begin to appear on the store shelves. So certainly it took some time question of fact before this court how long can you reasonably infer it would have taken let's go back only one year before the announcement of the termination January of 2017 master distributor premier was terminated. What events happen after this after this between January 2017 and February rather January 2016 February and 2017 there are discussions between LD cookie again, Mr. Master Simone. He expresses hesitation about entering into a new contract to subdistribute with an outfit known as Brown after he's his you know, prime distributor was already already terminated and what happens he expresses it in email. He gets a call from again from senior sales manager Ted Engel and he says, you know, what do you want we quote the language in the complaint, you know, 144 more stores will give you 144 more stores. So this is you know, a big big addition to Mr. Master Simone's route and he it's an inducement to him from a senior Kellogg person. Similarly, Mr. Aaronson engages in discussions including whether to acquire additional stores with employees of Kellogg he's advised by Kellogg not only to keep those but then to buy additional stores for his route this again in August 2016. My client Sue Lau didn't even buy a route at all until April 2016. That's again after the termination of premier and this is eight months before the announcement. Excuse me, you have a minute left. So this is the timeline of a one year before before the termination. Let's go back to why it's plausible going back even further back to 2013. In fact, in the fall of 2013, that's when project K is announced December 2013. We quote in the complaint premier senior employee. It's number one employee was then recruited and hired by Kellogg brought in house to handle distribution gentleman named David Biller and Kellogg then visits the warehouse of premier and interviews interrogates. We say other employees get their contact information Biller then keeps track of the routes and manages routes for Kellogg. So he comes from the distributor. It's a step toward bringing bringing distribution in-house. So we also find the court papers from December 2014. Excuse me, the summer of 2014 where outside counsel premier premier reaches the conclusion. They must be phasing out some distribution based on what Kellogg's trying to negotiate. So taking all these facts in the context in the timeline. We have plausibly pleaded this timeline and the court ought to reach reach the conclusion that there was an undisclosed intent dating back six years and ought to reverse the district court. Thank you. Madam clerk has Mr. Gray reserved any time. Yes, there's two minutes for a bottle. Okay, so we'll come back to Mr. Gray in due course counsel for the defendant appellee. Yes. Good afternoon. Your Honors. This is Dan Weiss for Kellogg your Honors. The district court was correct to dismiss the complaint for two primary reasons and I'll discuss both. I believe what we just heard doesn't address at all. The first reason which is that all of the claims that are on appeal depend on plaintiff alleging facts that establish a non-arm's-length relationship between the plaintiffs and Kellogg. There are three claims on appeal fiduciary duty constructive fraud and negligent misrepresentation and all three of those claims require facts establishing some type of special non-arm's-length relationship and that just isn't found in the complaint. The second reason your Honor that I'll get to is that there are no actionable misstatements alleged in the complaint. You just heard a little bit about that and I think that even in the in the statements that counsel spoke about you hear that there is at most vague encouragement about what might happen in the future and those are not actionable misrepresentations turning to the just very briefly before I turn to the first reason. I'll just mention factually in case this wasn't clear in counsel's presentation that the plaintiffs are sub-distributors who are not in privity with Kellogg. They don't have contracts with Kellogg. In fact, there's a third party called a master distributor that sits in between the plaintiffs and Kellogg. Kellogg has a contract with the master distributor. Those contracts are terminable and what essentially happened here, your honors, is that Kellogg terminated master distributor contracts. The complaint alleges how Kellogg did this through notice and through a termination period and there's no suggestion here that Kellogg wasn't legally entitled to terminate those contracts with the non-party master distributors. The sub-distributors have contracts with those master distributors and as I'll get to that's very important in terms of the relationships here. As I said, the first reason that dismissal was appropriate here is that plaintiffs must establish a non-arm's-length or special relationship with Kellogg. Time doesn't allow me to go through all the elements of the claims, but I know your honors are familiar with them. The bottom line is that these claims, fiduciary duty, constructive fraud, and negligent misrepresentation, they're all special types of claims that have special legal standards requiring some type of relationship, a special relationship, not a business relationship. And at most what's alleged here is a business relationship, not a special control relationship or confidential trusting relationship or a privity-like relationship. At most, it's a business relationship. And the reason I say at most is because the relationship is quite attenuated because these sub-distributors are not in privity with Kellogg. And so if we look at the facts that are alleged, we have a handful of discussions, meetings that took place in warehouses. There's three or four meetings alleged over a period of many years where there were many parties, many different sub-distributors allegedly at these meetings. These aren't secret or confidential meetings. They're simply business dealings about distributing a product. So there's no allegations of control, of required disclosures of confidential information. At most, simply arm's-length bargaining. And as the district court held, that's not enough to establish the type of special relationship required for these claims. And that shouldn't be surprising because New York courts have looked at many different relationships of this nature, be it franchisee relations or distributorship relations, gas stations, all kinds of relationships that are similar to a distribution relationship and held time and time again that it requires exceptional facts to establish a fiduciary duty or a relationship of special trust that would support a negligent misrepresentation claim. We cite the United Magazine case, for example, from the Southern District of New York, which holds that a relationship that went on for decades and decades involving exclusive territories and a voluntary disclosure of confidential information, that isn't enough to establish a breach of fiduciary duty under New York law. It requires much more in terms of control, in terms of required competences, that just isn't here. The Renzi and Sons case that I know Judge Raggi was part of the panel on that case, the Second Circuit 2016. That was a distributorship case involving, I believe, PASTA, an exclusive distributor of many years. And a judgment was entered in that case for the distributor because a distribution relationship simply isn't enough to establish a fiduciary duty. We cite several more cases in the briefing. Plaintiffs don't cite any case, not a single case in their briefing in the distribution context where a fiduciary duty or other special relationship was found. They cite a handful of cases from the securities context where somebody is soliciting a sale of securities. Those are completely different factual contexts. That reason alone, the failure to establish a special type of relationship, that's sufficient for the dismissal below and required the dismissal below. Very briefly, I'll turn to the second reason, the alleged misrepresentation. That's what counsel focused on. And if we look at what's pleaded in the complaint, there simply is not a misstatement of fact. There are multiple vague future type statements like sit tight, you're doing great, you're winning a lot of points. These are, as the district court said, vague encouragements at most. They're not actionable misrepresentations of fact. In terms of the so-called secret plan that counsel just focused on, that's alleged repeatedly on quote information and belief in the complaint with no suggestion as to where the information or belief comes from other than this reference to a 2014 litigation between Kellogg and Premier in which certain letters were made public. And the key aspect of that litigation is that it was a public litigation. And these letters that counsel just referred to a few moments ago, they were public in the court's docket. And to suggest that there was a secret plan hidden since 2014, and the reason we know that is because of these public letters on the court's docket, it doesn't add up. And that's what the district court held, that this so-called secret plan just isn't supported by any factual allegations. Very briefly, counsel referred to some statements in 2017. It's important, your honors, that there is no reliance of any type alleged in the year 2017 in the complaint. So what's alleged is that the plaintiffs did certain things in the year 2016 in terms of changing from one master distributor to the other in terms of acquiring new routes. There are allegations along those lines in 2016. There are no allegations of detrimental reliance in 2017. So again, there were no misstatements made, but even if we're going to look at any statements in 2017 and ask whether those are actionable misrepresentations, plaintiffs have not alleged anything about what they did or didn't do in respect of statements in 2017. And when we look closely at the 2017 statements, all we see is that in early 2017, Kellogg said there are some changes coming to the program. That's the email that counsel read. And then in May of 2017, Kellogg announced that it was terminating its contract with the master distributor, W.M. Brown. That termination didn't occur until August of 2017. So there's a three-month, you know, an ordinary course three-month type of termination that occurs between Kellogg and the master distributor. There's no allegation that Kellogg was not entitled to terminate on 90 days notice. And essentially, what plaintiffs are saying is they wish that this relationship had gone on longer. They wish it hadn't been terminated, but they don't allege that Kellogg ever told them that this relationship would go on any longer than it did. They don't allege that they were not compensated for all of the work that they performed while these contracts were in place. They simply allege that they wish that this relationship had continued. And so for that reason also, the complaint was properly dismissed. The argument I just made, I should have noted, goes to the second two counts. It goes to the constructive fraud count and the negligent misrepresentation count. So that's an alternative reason why counts two and three were appropriately dismissed. In briefing, plaintiffs suggest that they have another claim, a claim for fraudulent concealment. We don't agree with that. But even if you were to consider that as a ort claim, that claim would also require a type of special relationship, so-called special facts type of case. There is no special relationship for the reasons that I already covered, and there is no misrepresentation or omission of a fact for the reasons I also discussed. So for all of those reasons, the complaint was appropriately dismissed with prejudice. I'll stop there unless your honors have questions for me. Thank you, Mr. Weiss. Judge Rodge, any questions? I would like counsel for the appellant to address the argument that we've just heard that there are insufficient facts pleaded as to a relationship that would create a duty to disclose. Could you do that, please? You're addressing your question to- I'm sorry, to appellant's counsel. He's coming back in a little while. Do you have any questions for the appellant? I do not. We didn't ask questions of the appellant, so I thought you were inviting questions for either of them. I apologize. Let's, as it were, finish with Mr. Weiss, and then we'll go back to plaintiff's counsel. Judge Sullivan, any questions for Mr. Weiss? No, I don't. I don't have any questions for Mr. Weiss. So, Mr. Gray, you're up again, and Judge Rodge has a question for you. Did you hear my question, Mr. Gray? Yes. Thank you, Judge Rodge. And we do believe we've pleaded the relationship. As the court knows, there is the ability to plead a special relationship with some sparseness under the Suez equity case, where the other elements of the claim are pleaded in a negligent misrepresentation context that one party had superior knowledge and the other party acted based on mistaken knowledge. The facts that we've pleaded showing the relationship are regular communications and meetings with the plaintiff, and that's at Appendix 34, 36, 39, and 40, that Kellogg gave plaintiffs advice and encouragement to continue distributing Kellogg snack products. That's Appendix 38, 41, 43 to 46, that Kellogg repeatedly provided plaintiffs with assurances that their interests would be protected going forward. That's Appendix 38, 45, and 46, that Kellogg attended meetings with the plaintiffs, induced them to enter into these sub-distribution agreements in personal meetings, including with Senior, or excuse me, Regional Sales Director Engel, and that's found in Appendix 35, 36, 39, and 40, and 42. And Kellogg also directly took orders from and coordinated deliveries with plaintiffs, not through the master distributor. That's found in Appendix 34, 37, 45, and 46. And finally, Kellogg accepted special assistance from Plaintiff Aronson, so that's limited to Mr. Aronson and his companies as pleaded in the complaint, including his providing warehouse space for other Kellogg distributors to use out in New Jersey, where he was a substantial distributor. And if the court canvases the four corners of the complaint, you can also see there's a significant day-to-day rapport and relationship between the Kellogg personnel and certain of my clients, not all of them, mostly Mr. Mastro Simone and Mr. Aronson, where they're just talking with the senior personnel frequently about business and just have an ongoing close working business relationship, notwithstanding the lack of contractual privity. Thank you. Any other questions for Mr. Gray? Judge, this is Judge Sullivan. I mean, I guess it seems to me everything you just described sounds like just an arm's length relationship among distributors and people who have products to be distributed. You described yourself in the complaint as third-party independent contractor sub-distributors, right? Mr. Gray? Yes, Judge Sullivan. There's no question that the clients are independent sub-distributors. So the mere fact that they're doing business and they're talking about doing business and their sort of general statements about, you know, we'll continue doing business in the future, do you think that creates the equivalent of a fiduciary relationship? We think the provision of advice to these clients, among other things, in the context of knowledge that this entire distribution scheme is going away, creates a duty. This is a duty created by the exclusive knowledge within the exclusive, you know, province of Kellogg, and our clients have no way of finding out about it. They're acting based on mistaken knowledge, as Kellogg knows. So we would suggest that under the Brasby American Film Technologies case, there is a duty. Okay. Thank you very much, Mr. Gray and Mr. Weiss. We will reserve decision. And thank you both for your argument.